**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**LOUISVILLE DIVISION**

ANN J. MEANEY-GRUBE, individually and on behalf of all others similarly situated,

Plaintiff,

v.

CENTERWELL CERTIFIED HEALTHCARE CORP. and HUMANA, INC.

Defendants.

Case No. 3:26-CV-189-GNS

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff Ann J. Meaney-Grube ("Plaintiff"), individually and on behalf of all others similarly situated, by and through her undersigned counsel, brings this Class Action Complaint against Defendants CenterWell Certified Healthcare Corp. d/b/a CenterWell (hereinafter "CenterWell") and Humana, Inc. (hereinafter "Humana") (collectively "Defendants"). Plaintiff alleges the following upon information and belief based on the investigation of counsel, except as to those allegations that specifically pertain to Plaintiff, which are alleged upon personal knowledge.

## INTRODUCTION

1. Plaintiff and the proposed Class Members bring this class action lawsuit on behalf of all persons who entrusted Defendants with sensitive Personally Identifiable Information ("PII"[1]) and Protected Health Information ("PHI") (collectively, "Private Information") and that was

[1] Personally identifiable information generally incorporates information that can be used to distinguish or trace an individual's identity, either alone or when combined with other personal or identifying information. 2 C.F.R. § 200.79. At a minimum, it includes all information that on its face expressly identifies an individual.

impacted in a data breach.

2. Defendant CenterWell, operated by Humana, provides a range of healthcare services for seniors, including primary care, pharmacy services and prescriptions, and home health services in over 30 U.S. states.[2]

3. Defendant Humana is an American for-profit healthcare insurance company based in Louisville, Kentucky.[3]

4. Plaintiff's claims arise from Defendants' failure to properly secure and safeguard Private Information that was entrusted to them, and their accompanying responsibility to store and transfer that information.

5. On or around March 6, 2026, Defendant CenterWell reported a network intrusion that affected their systems (the "Data Breach") to the Office of the Attorney General of Texas.[4] The report confirms an unauthorized third-party accessed certain Private Information of patients, including but not limited to patient names, addresses, dates of birth, Social Security numbers, and medical information. [5]

6. Upon information and belief, a cybercriminals accessed Defendant CenterWell's network and exfiltrated Private Information of Defendants' current and former patients, including Plaintiff's.

7. Defendants lost control over that data when the cybercriminals infiltrated and Defendants insufficiently protected computer systems in the Data Breach, resulting in cybercriminals having unfettered access and, upon information and belief, the exfiltration of

---

[2] https://www.centerwell.com/about-us (Mar. 11, 2026).
[3] https://www.humana.com/about (March 11, 2026).
[4] *Notice of Data Security Incident Data Security Breach Reports*, ATTORNEY GENERAL OF TEXAS. (Mar. 11, 2026), https://oag.my.site.com/datasecuritybreachreport/apex/DataSecurityReportsPage
[5] *Id.*

Plaintiff and Class Members' Private information.

8. Upon information and belief, the cybercriminals were able to infiltrate Defendants' information systems for an extended period of time.

9. Plaintiff nor Class Members have received notice directly from Defendants concerning the Data Breach.

10. Defendants' prolonged investigation and response time, in addition to the *modus operandi* of cybercriminal groups to use a "double-extortion model,[6] strongly suggests either (i) Defendants only discovered the Data Breach upon delivery of a ransom note after cybercriminals completed most of their attack, or (ii) Defendants discovered the attack prior to the ransom note, but could not prevent cybercriminals from accessing and exfiltrating Private Information stored on Defendant CenterWell's network.

11. It is unknown for precisely how long the cybercriminals had access to Defendant CenterWell's network and systems before the data breach was revealed to them.

12. Given that the cybercriminals were able to infiltrate Defendant CenterWell's information systems for an extended period of time and perform malicious activity—including reconnaissance and data exfiltration functions that should have had alarm bells ringing—it is likely that Defendant CenterWell failed to implement reasonable (and Defendant Humana failed to ensure, require, or implement for its members) industry standard cybersecurity safeguards sufficient to detect malicious activity in a timely manner, including monitoring, logging, and alerting systems such as EDR, XDR, data loss prevention tools, and centralized alerting and logging.

---

[6] *#Stop Ransomware Guide*, CISA, https://www.cisa.gov/stopransomware/ransomware-guide (last visited Jan. 28, 2026).

13. In other words, Defendants had no effective means to prevent, detect, stop, or mitigate breaches of its systems—thereby allowing cybercriminals unrestricted access to Plaintiff and Class Members' Private Information.

14. Given the Defendant CenterWell's failure in even the most basic requirements of cybersecurity and Defendant Humana's failure to ensure that its members have adequate and reasonably cybersecurity, it is likely that Defendants' cybersecurity program as a whole is severely inadequate in comparison to the measures it is legally obligated to provide to individuals for whom it collects Personal Information, thus leaving them exposed to the Data Breach that indeed came into fruition.

15. Such a failure is beyond ordinary negligence that the Defendants disregard of Plaintiff and Class Members' rights was intentional, willful, or reckless when Defendants failed take adequate and reasonable measures to ensure Defendants data systems were protected against unauthorized intrusions; failing to take standard and reasonably available steps to prevent the Data Breach; and failing to provide Plaintiff and Class Members prompt and accurate notice of the Data Breach.

16. Indeed, given the foreseeability of the harms inherent in data breaches and the ubiquitous nature of data breaches, Defendants were substantially certain that their failure to implement reasonable cybersecurity standards would lead to Plaintiff and Class Members' harms.

17. Moreover, despite learning of the Data Breach on or around March 6, 2026, Defendant CenterWell still has not provided Plaintiff and Class Members notice on their website to inform the victims of the Data Breach.

18. Upon information and belief, Defendants have not sent out individualized notice letters to the victims of the Data Breach.

19. This timeline betrays a shockingly ill-prepared cybersecurity posture, particularly because KY REV. STAT. § 365.732 mandates that following discovery or notification of a breach of security system by an information holder, the information holder—which means any persons or business that conducts business in Kentucky—shall disclose the breach of system security to any resident of Kentucky whose personal information was, or is reasonably believed to have been, acquired by an unauthorized person *in the most expedient time possible and without unreasonable delay* from the discovery or notification of the breach. Should the information holder maintain computerized data that includes personally identifiable information that the information holder does not own shall notify the owner or licensee of the information of any breach of the security of the data *as soon as reasonably practicable* following discovery, if the personally identifiable information was, or is reasonably believed to have been, acquired by an unauthorized person. *Id*.

20. Defendants' delay in informing and failure to provide clear notice of the Data Breach even though Plaintiff and Class Members had their most sensitive information accessed, exfiltrated, and stolen, caused Plaintiff and Class Members to suffer ascertainable losses in the form of the loss of the benefit of their bargain and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach.

21. Moreover, Defendant Humana failed to adequately protect Plaintiff and Class Members' Private Information and failed to ensure that its members would maintain adequate safeguards to protect Plaintiff and the Class Members' Private Information.

22. As a result of the Data Breach, Plaintiff and Class Members, suffered concrete injuries in fact including, but not limited to: (i) invasion of privacy; (ii) theft of their Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss

of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) statutory damages; (viii) nominal damages; and (ix) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the Private Information.

23. The Data Breach was a direct result of Defendants' failure to implement adequate and reasonable cyber-security procedures and protocols necessary to protect Plaintiff and Class Members' Private Information from a foreseeable and preventable cyber-attack.

24. Defendants maintained, used, and shared Private Information in a reckless manner. In particular, the Private Information was used and transmitted by Defendant CenterWell in a condition vulnerable to cyberattacks. Upon information and belief, the mechanism of the cyberattack and potential for improper disclosure of Plaintiff and Class Members' Private Information was a known risk to Defendants, and thus, Defendants were on notice that failing to take steps necessary to secure the Private Information from those risks left that property in a dangerous condition.

25. Plaintiff brings this class action lawsuit on behalf all those similarly situated to address Defendants' inadequate safeguarding of Class Members' Private Information, and for failing to provide timely and adequate notice to Plaintiff and other Class Members that their information had been subject to the unauthorized access by an unknown third party and precisely what specific type of information was accessed.

26. Through this Complaint, Plaintiff seeks to remedy these harms on behalf of herself, and all similarly situated individuals whose Private Information was accessed during the Data

Breach.

27. The exposure of the Private Information to cybercriminals is a bell that cannot be unrung. Before this data breach, their Private Information was exactly that—private. Not anymore. Now, their Private Information is forever exposed and unsecure.

## PARTIES

28. Plaintiff Ann J. Meaney-Grube is and was, at all times material hereto, a resident and citizen of Seminole County, Florida, where she intends to remain.

29. Defendant CenterWell is a Delaware corporation with its headquarters and principal place of business located at 101 E. Main Street, Louisville, Kentucky 40202. Its registered agent, CT Corporation System, can be served at 306 W. Main Street, Suite 512, Frankfort, Kentucky 40601.

30. Defendant Humana is a Delaware corporation with its headquarters and principal place of business located at 500 West Main Street, Louisville, Kentucky 40202. Its registered agent, C T Corporation System, can be served at 306 W. Main Street, Suite 512, Frankfort, Kentucky 40601.

## JURISDICTION AND VENUE

31. This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). There are at least 100 putative Class Members, the aggregated claims of the individual Class Members exceed the sum or value of $5,000,000 exclusive of interest and costs, and members of the proposed Class, including Plaintiff, are citizens of states different from Defendant.

32. This Court has jurisdiction over Defendants through their business operations in this District, the specific nature of which occurs in this district. Defendants' principal place of

business is in this District. Defendants intentionally avail themselves of the markets within this District to render the exercise of jurisdiction by this Court just and proper.

33. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(1) because each Defendant's principal place of business is located in this District and a substantial part of the events and omissions giving rise to this action occurred in this District.

## FACTUAL ALLEGATIONS

### ***Background on Defendants***

34. Defendant CenterWell, operated by Humana, provides a range of healthcare services for seniors, including primary care, pharmacy services and prescriptions, and home health services in over 30 U.S. states.[7]

35. Defendant Humana is an American for-profit healthcare insurance company based in Louisville, Kentucky.[8]

36. As a part of their businesses Defendants collect and maintain the Private Information of thousands, if not hundreds of thousands, current and former patients.

37. Plaintiff and Class Members are comprised of current and former patients of Defendants. The Private Information provided by Plaintiff and Class Members includes, but is not limited to names, addresses, dates of birth, Social Security numbers, health insurance information, and medical information.

38. In collecting and maintaining Private Information, Defendants agreed they would safeguard the data in accordance with their internal policies, state law, and federal law. After all,

[7] https://www.centerwell.com/about-us (Mar. 11, 2026).
[8] https://www.humana.com/about (March 11, 2026).

Plaintiff and Class Members themselves took reasonable steps to secure their Private Information.

39. Further, Plaintiff and Class Members provided their Private Information to Defendants with the reasonable expectation, and on the mutual understanding, that Defendants would comply with their obligations to keep such information confidential and secure from unauthorized access.

40. Plaintiff and Class Members have taken reasonable steps to maintain the confidentiality of their Private Information. Plaintiff and Class Members relied on Defendants to keep their Private Information confidential and securely maintained, and to make only authorized disclosures of this information.

41. As a result of collecting and storing Plaintiff and Class Members' Private Information for their own financial benefit, Defendants had a continuous duty to adopt and employ reasonable measures to protect Plaintiff and Class Members' Private Information from disclosure to third parties.

42. On information and belief, Defendants have not implemented reasonable cybersecurity safeguards or policies to protect Plaintiff and Class Members' Private Information or supervised its providers and employees to prevent, detect, and stop breaches of their network or systems. As a result, Defendants leave significant vulnerabilities in their systems for cybercriminals to exploit and gain access to Plaintiff and Class Members' Private Information.

***The Data Breach***

43. On or around March 6, 2026, Defendant CenterWell reported a network intrusion that affected their systems (the "Data Breach") to the Office of the Attorney General of Texas.[9]

[9] *Notice of Data Security Incident Data Security Breach Reports*, ATTORNEY GENERAL OF TEXAS. (March 11, 2026), https://oag.my.site.com/datasecuritybreachreport/apex/DataSecurityReportsPage

The report confirms an unauthorized third-party accessed certain Private Information of patients, including but not limited to patient names, addresses, dates of birth, Social Security numbers, and medical information. [10]

44. Despite learning of the Data Breach at some point before providing notice to the Office of the Attorney General of Texas on March 6, 2026, Defendant CenterWell still has not provided Plaintiff and Class Members notice on their website to inform the victims of the Data Breach.

45. Upon information and belief, Defendants have not sent out individualized notice letters to the victims of the Data Breach.

46. Defendants have not provided the identity of the cybercriminals who perpetrated this Data Breach, the length of the Data Breach, details of the root cause of the Data Breach, the vulnerabilities exploited, and the remedial measures undertaken to ensure such a breach does not occur again.

47. Defendants have failed to inform, with any degree of specificity, Plaintiff and Class Members of the Data Breach's critical facts. Without these details, Plaintiff and Class Members' ability to mitigate the harms resulting from the Data Breach has been severely diminished.

48. This timeline betrays a shockingly ill-prepared cybersecurity posture, particularly because KY REV. STAT. § 365.732 mandates that following discovery or notification of a breach of security system by an information holder, the information holder—which means any persons or business that conducts business in Kentucky—shall disclose the breach of system security to any resident of Kentucky whose personal information was, or is reasonably believed to have been, acquired by an unauthorized person *in the most expedient time possible and without unreasonable*

---

[10] *Id.*

*delay* from the discovery or notification of the breach. Should the information holder maintain computerized data that includes personally identifiable information that the information holder does not own shall notify the owner or licensee of the information of any breach of the security of the data *as soon as reasonably practicable* following discovery, if the personally identifiable information was, or is reasonably believed to have been, acquired by an unauthorized person. *Id*.

49. Upon information and belief, cybercriminals accessed Defendant CenterWell's network and exfiltrated Private Information of Defendants' current and former patients, including Plaintiff's.

50. Defendants lost control over that data when cybercriminals infiltrated and Defendants insufficiently protected computer systems in the Data Breach, resulting in cybercriminals having unfettered access and, upon information and belief, the exfiltration of Plaintiff's and Class Members' Private information.

51. Upon information and belief, the cybercriminals were able to infiltrate Defendant CenterWell's information systems for an extended period of time.

52. Defendants' prolonged investigation and response time, in addition to the *modus operandi* to use a "double-extortion model,[11] strongly suggests either (i) Defendants only discovered the Data Breach upon delivery of a ransom note after cybercriminals completed most of its attack, or (ii) Defendants discovered the attack prior to the ransom note, but could not prevent cybercriminals from accessing and exfiltrating Private Information stored on Defendant AFSC's network.

---

[11] *#Stop Ransomware Guide*, CISA, https://www.cisa.gov/stopransomware/ransomware-guide (last visited Jan. 28, 2026).

53. It is unknown for precisely how long the cybercriminals had access to Defendant CenterWell's network and systems before the data breach was revealed to them.

54. Upon information and belief, had the cybercriminal group not informed Defendants of the Data Breach, Defendants likely would never have discovered the Data Breach.

55. Given that the cybercriminals were able to infiltrate Defendant CenterWell's information systems for an extended period of time and perform malicious activity—including reconnaissance and data exfiltration functions that should have had alarm bells ringing—it is likely that Defendant CenterWell failed to implement reasonable (and Defendant Humana failed to ensure, require, or implement for its providers) industry standard cybersecurity safeguards sufficient to detect malicious activity in a timely manner, including monitoring, logging, and alerting systems such as EDR, XDR, data loss prevention tools, and centralized alerting and logging.

56. In other words, Defendants had no effective means to prevent, detect, stop, or mitigate breaches of its systems—thereby allowing cybercriminals unrestricted access to Plaintiff and Class Members' Private Information.

57. Given the Defendant CenterWell's failure in even the most basic requirements of cybersecurity and Defendant Humana's failure to ensure that its providers has adequate and reasonably cybersecurity, it is likely that Defendants' cybersecurity program as a whole is severely inadequate in comparison to the measures it is legally obligated to provide to individuals for whom it collects Personal Information, thus leaving them exposed to the Data Breach that indeed came into fruition.

58. To date, Defendants have done nothing to provide Plaintiff and the Class Members with relief for the damage they have suffered because of the Data Breach. Defendants have not

even informed victims about the Data Breach and failed to offer any remedy, including credit monitoring.

59. Because of the Data Breach, the sensitive Private Information of Plaintiff and Class Members was placed into the hands of cybercriminals—inflicting numerous injuries and significant damages upon Plaintiff and Class Members.

60. Defendants owed a duty to protect Plaintiff and Class Members from the harm of the Data Breach.

61. Specifically, Defendant Humana owed a duty to protect Plaintiff and Class Members from the harm that its members' insufficient data security and the consequential exposure of Private Information would cause because such harm was foreseeable and reasonably preventable.

62. Defendant Humana also knew of the ubiquity of data breaches in the healthcare industry and that any breach of Defendant CenterWell's network and exposure of the data stored therein would result in the increased risk of identity theft and fraud for the tens of thousands of individuals whose Private Information was compromised, as well as intrusion into their private and sensitive financial matters.

63. Defendant Humana failed to ensure that Defendant CenterWell had adequate and reasonable means to meet the industry and FTC standards, as well as protect Defendant CenterWell's patients.

64. Moreover, Defendant CenterWell owed a duty to protect Plaintiff and Class Members from the harm that insufficient data security and the consequential exposure of Private Information would cause because such harm was foreseeable and reasonably preventable.

65. Defendant CenterWell knew of the ubiquity of data breaches in the healthcare industry and that any breach of its network and exposure of the data stored therein would result in the increased risk of identity theft and fraud for the tens of thousands of individuals whose Private Information was compromised, as well as intrusion into matters related to their sensitive Private Information.

66. Defendant CenterWell failed to implement adequate and reasonable means to meet the industry and FTC standards and failed to protect its current and former patients.

67. The Data Breach is the direct result of Defendants' failure to implement basic data security measures over consumers' data in its custody and control. Had Defendant CenterWell implemented reasonable cybersecurity measures and/or had Defendant Humana ensured that its members implement reasonable cybersecurity measures—including adequate safeguards for initial access, encryption, or redaction of personal data elements, and sufficient logging, monitoring, and alerting tools to detect unauthorized activity—cybercriminals would not have been able to hack into Defendant CenterWell's network, perform reconnaissance necessary to locate Plaintiff and Class Members' Private Information, and then exfiltrate that data before being detected.

68. Defendants' tortious conduct and breach of contractual obligations, as detailed in herein, are evidence by its failure to identify the scope of information involved and/or individuals impacted by the Data Breach until months after cybercriminals breached its network and accessed Plaintiff and Class Members' Private Information stored therein—meaning Defendants had no effective means in place to ensure that cyberattacks were detected, prevented, or timely investigated.

69. Moreover, Defendants' tortious conduct and breach of contractual obligations are evidence by, upon information and belief, the Defendants' failure to recognize the Data Breach until the cybercriminals alerted Defendants' via a ransom demand.

70. Defendants' gross negligence in safeguarding Plaintiff and Class Members' Private Information is exacerbated by the repeated warnings and alerts regarding the need to protect and secure sensitive data, as well as the ubiquitous nature of data breaches.

71. As a result of the Data Breach, Plaintiff and Class Members now face an increased risk of fraud and identity theft, among many other actual and imminent damages.

72. Moreover, Plaintiff and Class Members have an interest in ensuring that their Private Information, which is believed to remain in the possession of Defendants, is protected from further breaches.

73. Because of the Data Breach, the sensitive Private Information of Plaintiff and Class Members was placed into the hands of cybercriminals—inflicting numerous injuries and significant damages upon Plaintiff and Class Members.

***The Data Breach Was a Foreseeable Risk of Which Defendants Was on Notice***

74. Plaintiff and Class Members value their Private Information, as in today's electronic-centric world, their Private Information is required for numerous activities, such as verifying eligibility for employment, opening a new bank account or securing access to credit at favorable rates, and accessing benefits.

75. In light of recent high profile data breaches, Defendants knew or should have known that its electronic records would be targeted by cybercriminals.

76. In 2024, there were 3,158 data breaches with 1,350,835,988 victim notices, a 211%

increase from the previous year.[12]

77. In April 2020, ZDNet reported, in an article titled "Ransomware mentioned in 1,000+ SEC filings over the past year," that "[r]ansomware gangs are now ferociously aggressive in their pursuit of big companies. They breach networks, use specialized tools to maximize damage, leak corporate information on dark web portals, and even tip journalists to generate negative news for companies as revenge against those who refuse to pay."[13]

***78.*** In September 2020, the United States Cybersecurity and Infrastructure Security Agency published online a "Ransomware Guide" advising that "[m]alicious actors have adjusted their ransomware tactics over time to include pressuring victims for payment by threatening to release stolen data if they refuse to pay and publicly naming and shaming victims as secondary forms of extortion." [14]

79. Defendants' data security obligations were also particularly important given the substantial increase in Data Breaches in the healthcare industry preceding the date of the breach. Because of the value of its collected and stored data, the medical industry has experienced disproportionately higher numbers of data theft events than other industries.

80. Indeed, "Comparitech disclosed that in the first nine months of 2025, 293 ransomware attacks were recorded on hospitals, clinics, and other direct care providers. An additional 130 attacks targeted business within the healthcare sector, including pharmaceutical manufactures, medical billing providers, and healthcare tech companies."[15]

---

[12] 2024 DATA BREACH REPORT 6, IDENTITY THEFT RES. CTR. (Jan. 2025), https://www.idtheftcenter.org/wp-content/uploads/2025/02/ITRC_2024DataBreachReport.pdf.
[13] Catalin Cimpanu, *Ransomware Mentioned in 1,000+ SEC Filings Over the Past Year*, ZDNET (April 30, 2020), https://www.zdnet.com/article/ransomware-mentioned-in-1000-sec-filings-over-the-past-year/.
[14] *Stop Ransomware Guide*, CISA, https://www.cisa.gov/stopransomware/ransomware-guide (last visited Jan. 28, 2026).
[15] Anna Riberio, *Healthcare Ransomware Attacks Surge 30% in 2025, as Cybercriminals Shift Focus to Vendors and Service Partners*, COMPARITECH (Oct. 13, 2025),

81. The healthcare industry consistently reports as the industry with the highest, or one of the highest, number of data breaches.[16]

82. Further, "[i]n 2024, the healthcare industry experienced a concerning surge in data breaches, with over 300 million patient records compromised—a 26% increase from 2023."[17]

83. According to Advent Health University, when an electronic health record "lands in the hands of nefarious persons the results can range from fraud to identity theft to extortion. In fact, these records provide such valuable information that hackers can sell a single stolen medical record for up to $1,000."[18]

84. Drug manufacturers, medical device manufacturers, pharmacies, hospitals, and other healthcare service providers often purchase Private Information on the black market for the purpose of target-marketing their products and services to the physical maladies of the data breach victims themselves. Insurance companies purchase and use wrongfully disclosed PHI to adjust their insureds' medical insurance premiums.

85. According to an article in the HIPAA Journal posted on October 14, 2022, cybercriminals hack into medical practices for their "highly prized" medical records. "[T]he number of data breaches reported by HIPAA-regulated entities continues to increase every year. 2021 saw 714 data breaches of 500 or more records reported to the [HHS' Office for Civil Rights] OCR – an 11% increase from the previous year. Almost three-quarters of those breaches were

---

https://industrialcyber.co/reports/healthcare-ransomware-attacks-surge-30-in-2025-as-cybercriminals-shift-focus-to-vendors-and-service-partners/.

[16] IDENTITY THEFT RES. CTR., 2024 DATA BREACH REPORT 6, IDENTITY THEFT RES. CTR. 25 (Jan. 2025), https://www.idtheftcenter.org/wp-content/uploads/2025/02/ITRC_2024DataBreachReport.pdf.

[17] BLUESENSE, BREACH BAROMETER ANNUAL REPORT 2 (2025), https://bluesight.com/wp-content/uploads/2025/02/2025-Breach-Barometer-Annual-Report.pdf.

[18] *5 Important Elements to Establish Data Security in Healthcare*, ADVENT HEALTH UNIV. (May 21, 2020), https://www.ahu.edu/blog/data-security-in-healthcare.

classified as hacking/IT incidents."[19]

86. Healthcare organizations are easy targets because "even relatively small healthcare providers may store the records of hundreds of thousands of patients. The stored data is highly detailed, including demographic data, Social Security numbers, financial information, health insurance information, and medical and clinical data, and that information can be easily monetized."[20]

87. The HIPAA Journal article goes on to explain that patient records, are "often processed and packaged with other illegally obtained data to create full record sets (known as "Fullz" package) that contain extensive information on individuals, often in intimate detail." The record sets are then sold on dark web sites to other criminals and "allows an identity kit to be created, which can then be sold for considerable profit to identity thieves or other criminals to support an extensive range of criminal activities."[21]

88. Data breaches such as the one experienced by Defendants have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service have issued a warning to potential targets so they are aware of, can prepare for, and hopefully can ward off a potential attack.

89. In fact, according to the cybersecurity firm Mimecast, 90% of healthcare organizations experienced cyberattacks in 2020.[22]

90. These significant increases in attacks of companies, particularly those in the healthcare industry, and attendant risk of future attacks, is widely known to the public and to

---

[19] Steve Adler, *Editorial: Why Do Criminals Target Medical Records*, THE HIPAA J. (Nov. 2, 2023), https://www.hipaajournal.com/why-do-criminals-target-medical-records.
[20] *Id.*
[21] *Id.*
[22] Maria Henriquez, *Iowa City Hospital Suffers Phishing Attack*, SEC. MAGAZINE (Nov. 23, 2020), https://www.securitymagazine.com/articles/93988-iowa-city-hospital-suffers-phishing-attack.

anyone in that industry, including Defendants.

91. This readily available and accessible information confirms that, prior to the Data breach, Defendants knew or should have known that (i) cybercriminals were targeting entities such as Defendants, (ii) cybercriminals were ferociously aggressive in their pursuit of entities such as Defendants, (iii) cybercriminals were leaking corporate information on dark web portals, and (iv) cybercriminal tactics included threatening to release stolen data.

92. Before the Data Breach, Defendants knew or should have known that there was a foreseeable risk that Plaintiff and Class Members' Private Information could be accessed, exfiltrated, and published as a result of a cyberattack. Notably, data breaches are prevalent in today's society therefore making the risk of experiencing a data breach entirely foreseeable to Defendants.

93. Defendants knew or should have known that it should have encrypted its former and current patients' Private Information to protect against their publication and misuse in the event of a cyberattack.

***<u>Defendants Could Have Prevented the Data Breach</u>***

94. Data breaches are preventable.[23] Indeed, the American Bar Association published a treatise titled the Data Breach and Encryption Handbook wherein the author explained that:

a. "In almost all cases, the data breaches that occurred could have been prevented by proper planning and the correct design and implementation of appropriate security solutions." [24]

---

[23] Lucy L. Thomson, *Despite the Alarming Trends, Data Breaches Are Preventable*, DATA BREACH & ENCRYPTION HANDBOOK (2012).
[24] *Id.* at 17.

b. "Organizations that collect, use, store, and share sensitive personal data must accept responsibility for protecting the information and ensuring that it is not compromised[.]"[25]

c. "Most of the reported data breaches are a result of lax security and the failure to create or enforce appropriate security policies, rules, and procedures . . . . Appropriate information security controls, including encryption, must be implemented and enforced in a rigorous and disciplined manner so that a data breach never occurs."[26]

***<u>Defendants Fail to Comply with FTC Guidelines</u>***

95. The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

96. In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cyber-security guidelines for businesses. The guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.[27]

97. The guidelines also recommend that businesses use an intrusion detection system

---

[25] *Id.* at 28.
[26] *Id.*
[27] *Protecting Personal Information: A Guide for Business*, FED. TRADE COMM'N (Oct. 2016), https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.

to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.

98. The FTC further recommends that companies not maintain Private Information longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

99. The FTC further recommends that companies not maintain Private Information longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

100. The FTC has brought enforcement actions against businesses for failing to protect customer data adequately and reasonably, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

101. Defendants failed to properly implement basic data security practices, and their failure to employ reasonable and appropriate measures to protect against unauthorized access to individuals Private Information constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

102. Defendants at all times were fully aware of its obligation to protect Private Information of current and former patients. Defendants were also aware of the significant repercussions that would result from their failure to do so.

***Defendants Violated HIPAA***

103. Defendants are a covered business under HIPAA 945 C.F.R. § 160.102) and are required to comply with the HIPAA Privacy Rule and Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C.

104. Defendants are subject to the rules and regulations for safeguarding electronic forms of medical information pursuant to the Health Information Technology Act (“HITECH”).[28]

105. HIPAA circumscribes security provisions and data privacy responsibilities designed to keep medical information safe. HIPAA compliance provisions, commonly known as the Administrative Simplification Rules, establish national standards for electronic transactions and code sets to maintain the privacy and security of protected health information.[29]

106. HIPAA provides specific privacy rules that require comprehensive administrative, physical, and technical safeguards to ensure the confidentiality, integrity, and security of Private Information is properly maintained.[30]

---

[28] HIPAA and HITECH work in tandem to provide guideline and rules for maintaining protected health information, HITECH references and incorporates HIPAA.

[29] HIPAA lists 18 types of information that qualify as PHI according to guidance from the Department of Health and Human Services Office for Civil Rights, and includes, *inter alia*: names, addresses, any dates including dates of birth, Social Security numbers, and medical record numbers.

[30] *See* 45 C.F.R. § 164.306 (security standards and general rules); 45 C.F.R. § 164.308 (administrative safeguards); 45 C.F.R. § 164.310 (physical safeguards); 45 C.F.R. § 164.312 (technical safeguards).

107. The Data Breach itself resulted from a combination of inadequacies showing Defendants failed to comply with safeguards mandated by HIPAA. Defendants' security failures include, but are not limited to:

a. Failing to ensure the confidentiality and integrity of electronic PHI that it creates, receives, maintains, and transmits in violation of 45 C.F.R. § 164.306(a)(1);

b. Failing to protect against any reasonably-anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. § 164.306(a)(2);

c. Failing to protect against any reasonably anticipated uses or disclosures of electronic PHI that are not permitted under the privacy rules regarding individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3);

d. Failing to ensure compliance with HIPAA security standards by Defendants' workforce in violation of 45 C.F.R. § 164.306(a)(4);

e. Failing to implement technical policies and procedures for electronic information systems that maintain electronic PHI to allow access only to those persons or software programs that have been granted access rights in violation of 45 C.F.R. § 164.312(a)(1);

f. Failing to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 C.F.R. § 164.308(a)(1);

g. Failing to identify and respond to suspected or known security incidents and failing to mitigate, to the extent practicable, harmful effects of security incidents that are known to the covered entity in violation of 45 C.F.R. § 164.308(a)(6)(ii);

h. Failing to effectively train all staff members on the policies and procedures with respect to PHI as necessary and appropriate for staff members to carry out their functions and to maintain security of PHI in violation of 45 C.F.R. § 164.530(b) and 45 C.F.R. § 164.308(a)(5); and

i. Failing to design, implement, and enforce policies and procedures establishing physical and administrative safeguards to reasonably safeguard PHI, in compliance with 45 C.F.R. § 164.530(c).

108. Simply put, the Data Breach resulted from a combination of insufficiencies demonstrating that Defendants failed to comply with safeguards mandated by HIPAA regulations.

***<u>Defendants Failed to Comply with Industry Standards</u>***

109. As shown above, experts studying cyber security routinely identify businesses such

as the Defendants as being particularly vulnerable to cyberattacks because of the value of the Private Information which they collect and maintain.

110. To prevent and detect unauthorized cyber-attacks, Defendants could and should have implemented, as recommended by the United States Government, the following measures:

- Implement an awareness and training program. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.
- Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.
- Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.
- Configure firewalls to block access to known malicious IP addresses.
- Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.
- Set anti-virus and anti-malware programs to conduct regular scans automatically.
- Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.
- Configure access controls—including file, directory, and network share permissions—with at least privilege in mind. If a user only needs to read specific files, the user should not have written access to those files, directories, or shares.
- Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.
- Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.
- Consider disabling Remote Desktop protocol (RDP) if it is not being used.
- Use application whitelisting, which only allows systems to execute programs

known and permitted by security policy.

- Execute operating system environments or specific programs in a virtualized environment.

- Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.[31]

111. To prevent and detect cyber-attacks, including the cyber-attack that resulted in the Data Breach, Defendants could and should have implemented, as recommended by the United States Cybersecurity & Infrastructure Security Agency, the following measures:

- **Update and patch your computer**. Ensure your applications and operating systems (OSs) have been updated with the latest patches. Vulnerable applications and OSs are the target of most ransomware attacks . . . .

- **Use caution with links and when entering website addresses**. Be careful when clicking directly on links in emails, even if the sender appears to be someone you know. Attempt to independently verify website addresses (e.g., contact your organization's helpdesk, search the Internet for the sender organization's website or the topic mentioned in the email). Pay attention to the website addresses you click on, as well as those you enter yourself. Malicious website addresses often appear almost identical to legitimate sites, often using a slight variation in spelling or a different domain (e.g., .com instead of .net) . . . .

- **Open email attachments with caution**. Be wary of opening email attachments, even from senders you think you know, particularly when attachments are compressed files or ZIP files.

- **Keep your personal information safe**. Check a website's security to ensure the information you submit is encrypted before you provide it . . . .

- **Verify email senders**. If you are unsure whether or not an email is legitimate, try to verify the email's legitimacy by contacting the sender directly. Do not click on any links in the email. If possible, use a previous (legitimate) email to ensure the contact information you have for the sender is authentic before you contact them.

- **Inform yourself**. Keep yourself informed about recent cybersecurity threats and up to date on ransomware techniques. You can find information about known phishing attacks on the Anti-Phishing Working Group website. You may also want to sign up for CISA product notifications, which will alert you when a new Alert, Analysis

---

[31] HOW TO PROTECT YOUR NETWORKS FROM RANSOMWARE 3–4, FBI, https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view (U.S. Government Interagency technical guidance document) (last visited Jan. 28, 2026).

Report, Bulletin, Current Activity, or Tip has been published.

- **Use and maintain preventative software programs**. Install antivirus software, firewalls, and email filters—and keep them updated—to reduce malicious network traffic . . . .[32]

112. To prevent and detect cyber-attacks, including the cyber-attack that resulted in the Data Breach, Defendants could and should have implemented, as recommended by the Microsoft Threat Protection Intelligence Team, the following measures:

**Secure Internet-facing assets**

- Apply latest security updates
- Use threat and vulnerability management
- Perform regular audit; remove privileged credentials;

**Thoroughly investigate and remediate alerts**

- Prioritize and treat commodity malware infections as potential full compromise;

**Include IT Pros in security discussions**

- Ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely;

**Build credential hygiene**

- Use [multifactor authentication] or [network level authentication] and use strong, randomized, just-in-time local admin passwords

**Apply principle of least-privilege**

- Monitor for adversarial activities
- Hunt for brute force attempts
- Monitor for cleanup of Event Logs
- Analyze logon events

**Harden infrastructure**

- Use Windows Defender Firewall
- Enable tamper protection
- Enable cloud-delivered protection
- Turn on attack surface reduction rules and [Antimalware Scan Interface] for Office

[32] *Protecting Against Ransomware*, CYBERSECURITY & INFRASTRUCTURE SEC. AGENCY (April 11, 2019), https://www.cisa.gov/news-events/news/protecting-against-ransomware (revised Sept. 2, 2021).

[Visual Basic for Applications].[33]

113. Given that Defendants were storing Plaintiff and Class Members' Private Information, Defendants could and should have implemented all of the above measures to prevent and detect cyberattacks.

114. Defendants failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 2.0 (including without limitation PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

115. The foregoing frameworks are existing and applicable industry standards in the healthcare industry, and Defendants failed to comply with these accepted standards, thereby opening the door to and causing the Data Breach.

***The Data Breach Caused Plaintiff and the Class Members Injury and Damages***

116. Plaintiff and Class Members have suffered injury and damages from the unauthorized disclosure and misuse of their Private Information disclosed in the Data Breach that can be directly traced to Defendants, that has occurred, is ongoing, and/or will imminently occur.

117. Data Breaches such as the one experienced by Plaintiff and Class Members are especially problematic because of the disruption they cause to the daily lives of victims affected by the attack.

118. As stated prior, on information and belief, in the Data Breach, cybercriminals were

---

[33] *Human-Operated Ransomware Attacks: A Preventable Disaster*, MICROSOFT THREAT INTELLIGENCE (Mar. 5, 2020), https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster.

able to access the Plaintiff and Class Members' Private Information, which is now being used or will imminently be used for fraudulent purposes and/or has been sold for such purposes and posted on the Dark Web for sale, causing widespread injury and damages.

119. Once an individual's Private Information is for sale and accessed on the dark web, cybercriminals are able to use the stolen and compromised Private Information to gather and steal even more information.[34]

120. The ramifications of Defendants' failure to keep Plaintiff and the Class Members' Private Information secure are severe. Identity theft occurs when someone uses another person's personal and financial information such as that person's name, account number, Social Security number, driver's license number, date of birth, medical information or other information, such as addresses, without permission, to commit fraud or other crimes.

121. Because Defendants failed to prevent the Data Breach, Plaintiff and the Class Members have suffered, will imminently suffer, and will continue to suffer injury-in-fact and damages, including but not limited to:

a. The loss of the opportunity to control how Private Information is used;

b. Unauthorized use of stolen Private Information;

c. Dramatic increase in spam telephone calls;

d. Emotional distress;

e. The compromise and continuing publication of their Private Information;

f. Out-of-pocket expenses associated with the prevention, detection, recovery, and remediation from identity theft or fraud, and for necessary credit monitoring and identity theft protection;

g. Lost opportunity costs and lost wages associated with the time and effort expended addressing and trying to mitigate the actual and future consequences of the Data

[34] Ryan Toohil, *What do Hackers do with Stolen Information*, AURA, (September 5, 2023) https://www.aura.com/learn/what-do-hackers-do-with-stolen-information.

Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest, and recover from identity theft and fraud;

h. The diminution in value of their Private Information; and,

i. The continued risk to their Private Information, which remains in the possession of Defendants and is subject to further breaches so long as Defendants fail to undertake the appropriate measures to protect the Private Information in its possession.

***The Data Breach Caused Plaintiff and the Class Increased Risk of Identity Theft***

122. The Data Breach has placed Plaintiff and the Class Members at an increased risk of fraud and identity theft.

123. Plaintiff and Class Members are at a heightened risk of identity theft for years to come, especially because Defendants' failures resulted in Plaintiff and Class Members' Private Information falling into the hands of identity thieves.

124. Plaintiff and Class Members' unencrypted Private Information has already or will end up for sale on the dark web, because that is the *modus operandi* of cybercriminals. Indeed, when these criminals do not post the data to the dark web, it is usually at least sold on private Telegram channels to even further identity thieves who purchase Private Information for the express purpose of conducting financial fraud and identity theft operations.

125. Individuals' Private Information remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, Private Information can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[35] Experian reports that a stolen

[35] Anita George, *Your Personal Data Is for Sale on the Dark Web. Here's How Much It Costs*, DIGITAL TRENDS (Oct. 16, 2019), https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs.

credit or debit card number can sell for $5 to $110 on the dark web.[36] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[37]

126. Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts.

127. This data demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information…[is] worth more than 10x on the black market."[38]

128. Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing or even give false information to police.

129. Because a person's identity is akin to a puzzle with multiple data points, the more accurate pieces of data a cybercriminal obtains about a person, the easier it is for the cybercriminal to take on the victim's identity, or to track the victim to attempt other hacking crimes against the individual to obtain more data to perfect a crime.

130. For example, armed with just a name and date of birth, a cybercriminal can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate and trick individuals into disclosing additional confidential or personal information

---

[36] Brian Stack, *Here's How Much Your Personal Information Is Selling for on the Dark Web*, EXPERIAN (Dec. 6, 2017), https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web.
[37] *For Sale in the Dark*, VPNOverview, https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark (last visited Jan. 28, 2026).
[38] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10X Price of Stolen Credit Card Numbers*, (Feb. 6, 2015), https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html.

through means such as spam phone calls and text messages or phishing emails. Data breaches are often the starting point for these additional targeted attacks on the victims.

131. Further, the standard operating procedure for cybercriminals is to use some data, like Private Information here, to access "Fullz packages" of that person to gain access to the full suite of additional Private Information that those cybercriminals have access through other means. Using this technique, cybercriminals piece together full pictures of victims' information to perpetrate even more types of attacks.

132. With "Fullz" packages, cybercriminals can cross-reference two sources of Private Information to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy to assemble complete dossiers on individuals.

133. The development of "Fullz" packages means here that the stolen Private Information from the Data Breach can easily be used to link and identify it to Plaintiff and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the Private Information that was exfiltrated in the Data Breach, criminals may still easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over.

134. Further, using this technique, identity thieves piece together full pictures of victims' information to perpetrate even more types of attacks.

135. There are myriad dangers which affect victims of identity theft, including: cybercriminals opening new financial accounts, credit cards, and loans in victim's names; victim's losing health care benefits (medical identity theft); hackers taking over email and other accounts;

time and effort to repair credit scores; losing home due to mortgage and deed fraud; theft of tax refunds; hackers posting embarrassing posts on victim's social media accounts; victims spending large amounts of time and money to recover their identities; experiencing psychological harm and emotional distress; victims becoming further victimized by repeat instances of identity theft and fraud; cybercriminals committing crimes in victim's names; victims' personal data circulating the Dark Web forever; victims receiving increased spam telephone calls and emails; victims' children or elderly parents having their identities stolen.

136. Theft of PHI, in particular, is gravely serious: "A thief may use your name or health insurance numbers to see a doctor, get prescription drugs, file claims with your insurance provider, or get other care. If the thief's health information is mixed with yours, your treatment, insurance and payment records, and credit report may be affected."[39]

137. As indicated by Jim Trainor, second in command at the FBI's cyber security division: "Medical records are a gold mine for criminals—they can access a patient's name, DOB, Social Security and insurance numbers, and even financial information all in one place. Credit cards can be, say, five dollars or more where PHI records can go from $20 say up to—we've even seen $60 or $70."[40] A complete identity theft kit that includes health insurance credentials may be worth up to $1,000 on the black market, whereas stolen payment card information sells for about $1.[41]

---

[39] *See What to Know About Medical Identity Theft*, FTC (Sept. 2024), http://www.consumer.ftc.gov/articles/0171-medical-identity-theft.

[40] *You Got It, They Want It: Criminals Targeting Your Private Healthcare Data, New Ponemon Study Shows*, IDENTITY THEFT GUARD SOLS. (May 14, 2015), https://www.idexpertscorp.com/knowledge-center/single/you-got-it-they-want-it-criminals-are-targeting-your-private-healthcare-dat.

[41] *Managing Cyber Risks in an Interconnected World, Key Findings from the Global State of Information Security Survey 2015*, PRICEWATERHOUSECOOPERS (Sept. 30, 2014), https://www.pwc.com/ee/et/publications/pub/the-global-state-of-information-security-survey-2015.pdf.

138. According to Experian:

> Having your records stolen in a healthcare data breach can be a prescription for financial disaster. If scam artists break into healthcare networks and grab your medical information, they can impersonate you to get medical services, use your data open credit accounts, break into your bank accounts, obtain drugs illegally, and even blackmail you with sensitive personal details.
>
> ID theft victims often have to spend money to fix problems related to having their data stolen, which averages $600 according to the FTC. But security research firm Ponemon Institute found that healthcare identity theft victims spend nearly $13,500 dealing with their hassles, which can include the cost of paying off fraudulent medical bills.
>
> Victims of healthcare data breaches may also find themselves being denied care, coverage or reimbursement by their medical insurers, having their policies canceled or having to pay to reinstate their insurance, along with suffering damage to their credit ratings and scores. In the worst cases, they've been threatened with losing custody of their children, been charged with drug trafficking, found it hard to get hired for a job, or even been fired by their employers.[42]

139. The "high value of medical records on the dark web has surpassed that of social security and credit card numbers. These records can sell for up to $1,000 online."[43]

140. Additionally, Social Security numbers are particularly sensitive pieces of personal information. As the Consumer Federation of America explains:

> *This is the most dangerous type of personal information in the hands of identity thieves* because it can open the gate to serious fraud, from obtaining credit in your name to impersonating you to get medical services, government benefits, your tax refunds, employment – even using your identity in bankruptcy and other legal matters. It's hard to change your Social Security number and it's not a good idea because it is connected to your life in so many ways.[44] (Emphasis added).

141. Identity thieves can also use Social Security numbers to obtain a driver's license or

---

[42] Brian O'Connerr, *Healthcare Data Breach: What to Know About Them and What to Do After One*, EXPERIAN (Mar. 31, 2023), https://www.experian.com/blogs/ask-experian/healthcare-data-breach-what-to-know-about-them-and-what-to-do-after-one/, https://web.archive.org/web/20250112215107/https://www.experian.com/blogs/ask-experian/healthcare-data-breach-what-to-know-about-them-and-what-to-do-after-one/].

[43] Andrew Steger, *What Happens to Stolen Healthcare Data*, HEALTHTECH (Oct. 30, 2019), https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon.

[44] *Dark Web Monitoring: What You Should Know*, CONSUMER FED'N OF AM. (Mar. 19, 2019), https://consumerfed.org/consumer_info/dark-web-monitoring-what-you-should-know/.

official identification card in the victim's name but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's Social Security number, rent a house or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest resulting in an arrest warrant being issued in the victim's name. And the Social Security Administration has warned that identity thieves can use an individual's Social Security number to apply for additional credit lines.[45]

142. Individuals, like Plaintiff and Class Members, are particularly concerned with protecting the privacy of their Social Security numbers, which are the key to stealing any person's identity and is likened to accessing your DNA for hackers' purposes.

143. According to the Social Security Administration, each time an individual's Social Security number is compromised, "the potential for a thief to illegitimately gain access to bank accounts, credit cards, driving records, tax and employment histories and other private information increases."[46] Moreover, "[b]ecause many organizations still use SSNs as the primary identifier, exposure to identity theft and fraud remains."[47]

144. A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items

---

[45] *Identity Theft and Your Social Security Number*, SOC. SEC. ADMIN. 1 (2018), https://www.ssa.gov/pubs/EN-05-10064.pdf.

[46] *See Avoid Identity Theft*, SOC. SEC. ADMIN., https://www.ssa.gov/phila/ProtectingSSNs.htm#:~:text=An%20organization's%20collection%20and%20use,and%20other%20private%20information%20increases (last visited Jan. 28, 2026).

[47] *Id.*

you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[48]

145. In fact, "[a] stolen Social Security number is one of the leading causes of identity theft and can threaten your financial health."[49] "Someone who has your SSN can use it to impersonate you, obtain credit and open bank accounts, apply for jobs, steal your tax refunds, get medical treatment, and steal your government benefits."[50]

146. Driver's license numbers, which were compromised in the Data Breach, are incredibly valuable. "Hackers harvest license numbers because they're a very valuable piece of information."[51]

147. A driver's license can be a critical part of a fraudulent, synthetic identity – which go for about $1200 on the Dark Web. On its own, a forged license can sell for around $200."[52]

148. According to the national credit bureau Experian:

> A driver's license is an identity thief's paradise. With that one card, someone knows your birthdate, address, and even your height, eye color, and signature. If someone gets your driver's license number, it is also concerning because it's connected to your vehicle registration and insurance policies, as well as records on file with the Department of Motor Vehicles, place of employment (that keep a copy of your driver's license on file), doctor's office, government agencies, and other entities. Having access to that one number can provide an identity thief with several pieces of information they want to know about you. Next to your Social Security number, your driver's license number is one of the most important pieces of information to keep safe from thieves.

---

[48] *Identity Theft and Your Social Security Number*, SOC. SEC. ADMIN. (Oct. 2024), https://www.ssa.gov/pubs/EN-05-10064.pdf.

[49] *See How to Protect Yourself from Social Security Number Identity Theft*, EQUIFAX, https://www.equifax.com/personal/education/identity-theft/articles/-/learn/social-security-number-identity-theft/ (last visited Jan. 28, 2026).

[50] *See* Julia Kagan, *What Is a SSN? What to Know About Social Security Numbers*, INVESTOPEDIA (Sept. 2, 2024) https://www.investopedia.com/terms/s/ssn.asp.

[51] Anna Tong, *Hackers Stole Consumers' License Numbers from Geico in Months-Long Breach*, FORBES (Apr. 20, 2021), https://www.forbes.com/sites/leemathews/2021/04/20/hackers-stole-consumers-license-numbers-from-geico-in-months-long-breach/?sh=3bda585e8658.

[52] *Id.*

149. According to cybersecurity specialty publication CPO Magazine, "[t]o those unfamiliar with the world of fraud, driver's license numbers might seem like a relatively harmless piece of information to lose if it happens in isolation."[53] However, this is not the case. As cybersecurity experts point out:

> "It's a gold mine for hackers. With a driver's license number, bad actors can manufacture fake IDs, slotting in the number for any form that requires ID verification, or use the information to craft curated social engineering phishing attacks."[54]

150. Victims of driver's license number theft also often suffer unemployment benefit fraud, as described in a recent New York Times article.[55]

151. Such fraud may go undetected until debt collection calls commence months, or even years later. Stolen Social Security numbers also make it possible for thieves to file fraudulent tax returns, file for unemployment benefits, or apply for a job using a false identity. Each of these fraudulent activities is difficult to detect. An individual may not know that his or her Social Security Number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

152. Data Breach victims suffer long-term consequences when their social security numbers are taken and used by hackers. Even if they know their social security numbers are being misused, Plaintiff and Class Members cannot obtain new numbers unless they become a victim of social security number misuse.

---

[53] Scott Ikeda, *Geico Data Breach Leaks Driver's License Numbers, Advises Customers to Watch Out for Fraudulent Unemployment Claims*, CPO MAG. (Apr. 23, 2021), https://www.cpomagazine.com/cyber-security/geico-data-breach-leaks-drivers-license-numbers-advises-customers-to-watch-out-for-fraudulent-unemployment-claims/.

[54] *Id.*

[55] *How Identity Thieves Took My Wife for a Ride,* NY Times (April 27, 2021), https://www.nytimes.com/2021/04/27/your-money/identity-theft-auto-insurance.html.

153. It is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

154. Even then, a new Social Security number may not be effective. According to Julie Ferguson of the Identity Theft Resource Center, "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[56]

155. Similarly, the Social Security Administration has warned that "a new number probably won't solve all your problems. This is because other governmental agencies (such as the IRS and state motor vehicle agencies) and private businesses (such as banks and credit reporting companies) will have records under your old number. Along with other personal information, credit reporting companies use the number to identify your credit record. So, using a new number won't guarantee you a fresh start. This is especially true if your other PII, such as your name and address, remains the same."[57]

156. Further, the California state government states that "[o]riginally, your Social Security number (SSN) was a way for the government to track your earnings and pay you retirement benefits. But over the years, it has become much more than that. It is the key to a lot of

---

[56] Bryan Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millionsworrying-about-identity-theft.
[57] *Identity Theft and Your Social Security Number*, Pub. No. 05-10064, SOCIAL SEC. ADMIN. (July 2021), https://www.ssa.gov/pubs/EN-05-10064.pdf.

your personal information. With your name and SSN, an identity thief could open new credit and bank accounts, rent an apartment, or even get a job."[58]

157. The FTC recommends that identity theft victims take several costly steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for 7 years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, seeking a credit freeze, and correcting their credit reports.[59]

158. Further, according to the Identity Theft Resource Center's 2021 Consumer Aftermath Report, identity theft victims suffer "staggering" emotional tolls. For example, nearly 30% of victims have been the victim of a previous identity crime; an all-time high number of victims say they have contemplated suicide. Moreover, thirty-three percent reported not having enough money to pay for food and utilities, while 14% were evicted because they couldn't pay rent or their mortgage. Fifty-four percent reported feelings of being violated.[60]

159. What's more, theft of Private Information is also gravely serious outside of the traditional risks of identity theft. In the last two decades, as more and more of our lives become interconnected through the lens of massively complex cloud computing, Private Information is a valuable property right.

---

[58] *See Your Social Security Number: Controlling the Key to Identity Theft*, CAL. DEPT. JUST. https://oag.ca.gov/idtheft/facts/your-ssn (last visited Jan. 28, 2026).
[59] *What To Do Right Away*, FTC (2024), https://www.identitytheft.gov/Steps.
[60] *The Identity Theft Resource Center's 2021 Consumer Aftermath Report Reveals Impacts on Covid-19 Identit Crime Victims*, IDENTITY THEFT RES. CTR. (May, 26, 2021), https://www.idtheftcenter.org/post/the-identity-theft-resource-centers-2021-consumer-aftermath-report-reveals-impacts-on-covid-19-identity-crime-victims/.

160. Private Information is such a valuable commodity to cybercriminals that once the information has been compromised, criminals often trade the information on the "cyber black-market" for years.

161. Where the most Private Information belonging to Plaintiff and Class Members was accessible from Defendants' network, there is a strong probability that entire batches of stolen information have been dumped on the black market and are yet to be dumped on the black market, meaning Plaintiff and the Class Members are at an increased risk of fraud and identity theft for many years into the future.

162. Further, there may be a substantial time lag—measured in years—between when harm occurs versus when it is discovered, and between when Private Information and/or financial information is stolen and when it is used. According to the U.S. Government Accountability Office, which studied data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[61]

163. Thus, Plaintiff and the Class Members must vigilantly monitor their financial and credit accounts for many years to come.

164. Accordingly, the Data Breach has caused Plaintiff and Class Members a greatly increased risk of identity theft and fraud, in addition to the other injuries and damages set forth herein.

[61] *See* GAO Report, at p. 29.

165. Defendants knew or should have known of these harms which would be caused by the Data Breach they permitted to occur and strengthened its data systems accordingly.

***Loss of Time to Mitigate Risk of Identity Theft and Fraud***

166. Because of the recognized risk of identity theft, when a data breach occurs, and an individual is notified by a company that their Private Information was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft of fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm and Defendants arguing that the individual failed to mitigate damages.

167. The need to spend time mitigating the risk of harm is especially important in cases like this where Plaintiff and Class Members' Social Security numbers and other government identification are affected.

168. By spending this time, Plaintiff and Class Members were not manufacturing their own harm, they were taking necessary steps at Defendants' direction and because of this the Data Breach included their Social Security numbers.

169. Plaintiff and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions to remedy the harms they have or may experience because of the Data Breach, such as contacting credit bureaus to place freezes on their accounts; changing passwords and re-securing their own computer networks; and checking their financial accounts for any indication of fraudulent activity, which may take years to detect.

170. These efforts are consistent with the U.S. Government Accountability Office that released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims

of identity theft will face "substantial costs and time to repair the damage to her good name and credit record."[62]

***Diminution in Value of Private Information***

171. PII and PHI are valuable property rights.[63] Their value is axiomatic, considering the value of Big Data in corporate America and the consequences of cyber thefts include heavy prison sentences. Even this obvious risk-to-reward analysis illustrates beyond doubt that Private Information has considerable market value.

172. An active and robust legitimate marketplace for Private Information exists. In 2019, the data brokering industry was worth roughly $200 billion.[64]

173. In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[65]

174. Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50.00 a year.[66]

175. Conversely, sensitive PII can sell for as much as $363 per record on the dark web according to the Infosec Institute.[67]

---

[62] *See* GAO-07-737, *Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*, U.S. GOV'T OFFICE, (June 2007), https://www.gao.gov/new.items/d07737.pdf.

[63] *See, e.g.*, Randall T. Soma et al, *Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("Private Information") Equals the "Value" of Financial Assets*, 15 RICH. J.L. & TECH. 11, at *3-4 (2009) ("Private Information, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

[64] David Lazarus, *Shadowy Data Brokers Make the Most of Their Invisibility Cloak*, L.A. TIMES (Nov. 5, 2019), https://www.latimes.com/business/story/2019-11-05/column-data-brokers.

[65] *See e.g.*, https://datacoup.com/ (last visited Jan. 28, 2026).

[66] *Frequently Asked Questions*, NIELSON COMPUT. & MOBIL PANEL, https://computermobilepanel.nielsen.com/ui/US/en/faqen.html (last visited Jan. 28, 2026).

[67] *See* Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, InfoSec (July 27, 2015), https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/.

176. As a result of the Data Breach, Plaintiff and Class Members' Private Information, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished by its compromise and unauthorized release. However, this transfer of value occurred without any consideration paid to Plaintiff or Class Members for their property, resulting in an economic loss. Moreover, Private Information is now readily available, and the rarity of the Data has been lost, thereby causing additional loss of value.

***The Future Cost of Credit and Identity Theft Monitoring Is Reasonable and Necessary***

177. Based on the value of the information stolen, the data either has or will be sold to cybercriminals whose mission it is to perpetrate identity theft and fraud. Even if the data is not posted online, these data are ordinarily sold and transferred through private Telegram channels wherein thousands of cybercriminals participate in a market for such data so that they can misuse it and earn money from financial fraud and identity theft of data breach victims.

178. Such fraud may go undetected for years; consequently, Plaintiff and Class Members are at a present and continuous risk of fraud and identity theft for many years into the future.

179. The retail cost of credit monitoring and identity theft monitoring can cost $200 or more per year per Class Member. This is a reasonable and necessary cost to monitor and protect Class Members from the risk of identity theft that arose from the Data Breach. This is a future cost for a minimum of seven years that Plaintiff and Class Members would not need to bear but for Defendants' failure to safeguard their Private Information.

***Lost Benefit of the Bargain***

180. Furthermore, Defendants' poor data security deprived Plaintiff and Class Members of the benefit of their bargain. When agreeing to provide Defendants with their Private Information under certain terms, Plaintiff and Class Members understood and expected that Defendants would properly safeguard and protect their Private Information, when in fact, Defendants did not provide

the expected data security. Accordingly, Plaintiff and Class Members received services and/or employment of a lesser value than what they reasonably expected to receive under the bargains they struck with Defendants.

***Plaintiff's Experience and Injuries***

181. Plaintiff Meaney-Grube is a former patient of Defendant CenterWell. In order to receive treatment as a patient with Defendant CenterWell, Defendants conditioned treatment upon receipt of Plaintiff's Private Information. As such, Plaintiff provided Defendants with her Private Information, which was then used to facilitate treatment of Plaintiff.

182. Upon information and belief, at the time of the Data Breach, Defendant CenterWell maintained Plaintiff's Private Information in its system.

183. Plaintiff is very careful about sharing her Private Information. Plaintiff stores any documents containing her Private Information in a safe and secure location. She has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source. Plaintiff would not have entrusted her Private Information to Defendants had she known of Defendants' grossly inadequate data security policies.

184. In order to obtain services from Defendant CenterWell, Plaintiff was required to provide her Private Information to Defendant CenterWell, including among other things, her name, date of birth, contact information, Social Security number, driver's license, health insurance information, and medical history.

185. As a result of the Data Breach, Plaintiff made reasonable efforts to mitigate the impact of the Data Breach, including researching and verifying the legitimacy of the Data Breach. Plaintiff has spent significant time, roughly one (1) hour, dealing with the Data Breach—valuable

time Plaintiff otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

186. As a result of the Data Breach, Plaintiff made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to researching the Data Breach and reviewing financial account statements for any indications of actual or attempted identity theft or fraud.

187. Plaintiff suffered actual injury from having her Private Information compromised as a result of the Data Breach including, but not limited to: (i) invasion of privacy; (ii) theft of her Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vii) statutory damages; (viii) nominal damages; and (ix) the continued and certainly increased risk to her Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the Private Information.

188. Plaintiff suffered actual injury from the increase in spam calls and communications, suggesting that her Private Information has been stolen and is now in the hands of cybercriminals.

189. Upon information and belief, as a result of its inadequate cybersecurity, Defendants exposed Plaintiff's Private Information for theft by cybercriminals and sale on the dark web.

190. Plaintiff anticipates spending considerable time and money on an ongoing basis to try and mitigate and address harms caused by the Data Breach.

191. As a result of the Data Breach, Plaintiff is at present risk and will continue to be at an increased risk of identity theft and fraud for years to come.

192. Plaintiff has a continuing interest in ensuring her Private Information which, upon information and belief, remains backed up in Defendants' possession, is protected and safeguarded from future breaches.

193. Plaintiff greatly values her privacy, and would not have provided her Private Information, undertaken the services and paid the amounts that she did if she had known that her Private Information would be maintained using inadequate data security systems.

## CLASS ALLEGATIONS

194. Pursuant to Fed. R. Civ. P. 23(a), 23(b)(1), 23(b)(2), and 23(b)(3), Plaintiff proposes the following class definition, subject to amendment as appropriate:

> All individuals residing in the United States whose Private Information was compromised in the Data Breach (the "Class").

195. Excluded from the Class are Defendants, their agents, affiliates, parents, subsidiaries, any entity in which Defendants has a controlling interest, any Defendants officer or director, any successor or assign, and any Judge who adjudicates this case, including their staff and immediate family.

196. Plaintiff reserves the right to amend the definition of the Class or add a class or subclass if further information and discovery indicate that the definition of the Class should be narrowed, expanded, or otherwise modified.

197. Plaintiff and the Class constitute a well-defined community of interest—they are similarly situated persons and were similarly affected and damaged by the alleged conduct of Defendants.

198. Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of her claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions asserting the same claims.

199. This action satisfies the numerosity, commonality, typicality, and adequacy requirements under Fed. R. Civ. P. 23(a)(1)-(4).

200. Ascertainability. All members of the proposed Class are readily ascertainable from information in Defendants' custody and control.

201. Numerosity. The Class is so numerous that joinder of all members is impracticable. Upon information and belief, the Class includes thousands of members.

202. Typicality. Plaintiff's claims are typical of the Class's claims as each arises from the same Data Breach, the same alleged violations by Defendants, and the same deficiency in notifying individuals about the Data Breach.

203. Adequacy. Plaintiff will fairly and adequately protect the proposed Class's common interests. Her interests do not conflict with Class Members' interests. Plaintiff has retained counsel—including lead counsel—that is experienced in complex class action litigation and data privacy to prosecute this action on the Class's behalf.

204. Commonality and Predominance. Plaintiff and the Class's claims raise predominantly common facts and legal questions—which predominate over any questions affecting individual Class Members—for which a class wide proceeding can answer for all Class Members. In fact, a class wide proceeding is necessary to answer the following questions:

a. if Defendants had a duty to use reasonable care in safeguarding Plaintiff and the Class's Private Information;

b. if Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

c. if Defendants were negligent in maintaining, protecting, and securing Plaintiff and the Class's Private Information;

d. if Defendants breached contract promises to safeguard Plaintiff and the Class's Private Information;

e. if Defendants took reasonable measures to determine the extent of the Data Breach after discovering it;

f. if Defendants' Breach Notice, or lack thereof, was reasonable;

g. if the Data Breach caused Plaintiff and the Class injuries;

h. what the proper damages measure is; and

i. if Plaintiff and the Class are entitled to damages, treble damages, and or injunctive relief.

205. Superiority. A class action will provide substantial benefits and is superior to all other available means for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by Plaintiff and the Class are relatively small compared to the burden and expense that individual litigation against Defendants would require. Thus, it would be practically impossible for Plaintiff and the Class, on an individual basis, to obtain effective redress for their injuries. Not only would individualized litigation increase the delay and expense to all parties and the courts, but individualized litigation would also create the danger of inconsistent or contradictory judgments arising from the same set of facts. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, ensures economies of scale, provides comprehensive supervision by a single court, and presents no unusual management difficulties.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION
**Gross Negligence and Negligence *Per Se***
**(On Behalf of Plaintiff and the Class against Defendants)**

206. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

207. Plaintiff brings this claim individually and on behalf of the Class.

208. Defendants knowingly collected, came into possession of, and maintained Plaintiff and the Class's Private Information, and had a duty to exercise reasonable care in safeguarding, securing, and protecting such information from being compromised, lost, stolen, misused, and/or disclosed to unauthorized parties.

209. Defendants had a duty to have procedures in place to detect and prevent the loss or unauthorized dissemination of Plaintiff and the Class's Private Information.

210. Defendants had, and continue to have, a duty to timely disclose that Plaintiff and the Class's Private Information within its possession was compromised and precisely the types of information that were compromised.

211. Defendants owed a duty of care to Plaintiff and the Class to provide data security consistent with industry standards, applicable standards of care from statutory authority like Section 5 of the FTC Act, and other requirements discussed herein, and to ensure that its systems and networks, and the personnel responsible for them, adequately protected individuals' Private Information.

212. Section 5 of the FTC Act, 15 U.S.C. 45, prohibits "unfair . . . practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice by Defendants of failing to use reasonable measures to protect Plaintiff and the Class's Private Information. Various FTC publications and orders also form the basis of Defendants' duties.

213. In particular, Defendant CenterWell and Defendant Humana's duty of care to use reasonable security measures arose as a result of a special relationship that existed between it and its patients. Both Defendants were in a position to ensure that Defendant CenterWell's systems were sufficient to protect against the foreseeable risk of harm to Plaintiff and the Class from a data breach.

214. By accepting, collecting, and storing Defendant CenterWell's patients' Private Information, Defendants took on the obligation and duty to safeguard the highly sensitive Private Information from unauthorized disclosures, but failed to do so.

215. Defendants' duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendants are bound by industry standards to protect confidential Private Information.

216. Defendants breached these duties by failing to exercise reasonable care in safeguarding and protecting Plaintiff and the Class's Private Information.

217. The specific reckless and grossly negligent acts and omissions committed by Defendants include, but are not limited to, the following:

a. Failing to adopt, implement, and maintain adequate security measures to safeguard Plaintiff and the Class's Private Information;

b. Failing to adequately monitor the security of their networks and systems and to identify reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of patient information; and

c. Failing to periodically ensure that its computer systems and networks had plans in place to maintain reasonable data security safeguards.

d. Failing to detect the breach at the time it began or within a reasonable time thereafter; and

e. Failing to follow their own privacy policies and practices published to their employees and residents.

218. Defendants' conduct went far beyond ordinary negligence. Defendants acted with

gross negligence by consciously and recklessly disregarding known risks to Plaintiff and the Class's Private Information, including by failing to implement basic and industry-standard cybersecurity measures, failing to adequately monitor its systems for unauthorized access, failing to remediate known security vulnerabilities, failing to properly train employees on data security, and failing to timely detect and prevent the Data Breach. Defendants knew or should have known that their inadequate data-security practices created a high probability of harm to Plaintiff and the Class, yet Defendants consciously failed to take reasonable steps to prevent that harm.

219. Defendants' grossly negligent conduct demonstrated a substantial lack of concern for whether injury would result to Plaintiff and the Class. Defendants' actions and omissions constitute a reckless indifference to the rights, safety, and interests of Plaintiff and the Class, whose Private Information, Defendants were entrusted to protect.

220. Specifically, Defendant Humana acted with gross negligence by consciously and recklessly ignoring its duty to ensure its provider CenterWell, despite the ubiquity of data breaches, had adequate security safeguards to protect Plaintiff and the Class's Private Information to ensure Defendant CenterWell's processes were sufficient to detect unauthorized access to their network or compromises of Private Information stored therein.

221. Further, Defendant CenterWell acted with gross negligence by consciously and recklessly ignoring its duty to protect Plaintiff and the Class's Private Information, despite the ubiquity of data breaches, in the healthcare industry, as described above. Defendant CenterWell's actions and omissions constituted a reckless indifference to the rights, safety, and interests of Plaintiff and the Class, whose Private Information, Defendant CenterWell was entrusted to protect.

222. Moreover, Defendants violated Section 5 of the FTC Act (and similar state statutes) by failing to use reasonable measures to protect Plaintiff and Class's Private Information and by

failing to comply with industry standards.

223. Defendants' conduct was particularly unreasonable given the nature and amount of Private Information obtained and stored and the foreseeable consequences of a data breach on Defendants' systems.

224. The Class is comprised of consumers within the class of persons Section 5 of the FTC Act (and similar state statutes) were intended to protect.

225. Moreover, the harm that has occurred is the type of harm the FTC Act (and similar state statutes) was intended to guard against. Indeed, the FTC has pursued over fifty (50) enforcement actions against businesses which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm suffered by Plaintiff and the Class.

226. Further, under HIPAA, 42 U.S.C. § 1302d. et. seq., Defendants have a duty to implement reasonable safeguards to protect Plaintiff and the Class's Private Information.

227. Pursuant to HIPAA, Defendants had a duty to render the electronic PHI they maintained unusable, unreadable, or indecipherable to unauthorized individuals, as specified in the HIPAA Security Rule by "the use of an algorithmic process to transform data into a form in which there is a low probability of assigning meaning without use of a confidential process or key." *See* definition of encryption at 45 C.F.R. § 164.304.

228. Defendants, through their actions and/or omissions, unlawfully breached their duties to Plaintiff and the Class by failing to exercise reasonable care in protecting and safeguarding Plaintiff and the Class's Private Information within Defendants' possession.

229. Defendants, through their actions and/or omissions, unlawfully breached their duties to Plaintiff and the Class by failing to have appropriate procedures in place to detect and

prevent dissemination of Plaintiff and the Class's Private Information.

230. Defendants, through their actions and/or omissions, unlawfully breached their duty to timely disclose to Plaintiff and the Class that the Private Information within Defendants' possession might have been compromised and precisely the type of information compromised.

231. Defendants breached the duties set forth in 15 U.S.C. § 45, the FTC guidelines, the National Institute of Standards and Technology's Framework for Improving Critical Infrastructure Cybersecurity, and other industry guidelines. In violation of 15 U.S.C. § 45, Defendants failed to implement proper data security procedures to adequately and reasonably protect Plaintiff and the Class's Private Information. In violation of the FTC guidelines, *inter alia,* Defendants did not protect the Private Information they keep; failed to properly dispose of personal information that was no longer needed; failed to encrypt information stored on computer networks; lacked the requisite understanding of its networks' vulnerabilities; and failed to implement policies to correct security issues.

232. It was foreseeable that Defendants' failure to use reasonable measures to protect Plaintiff and the Class's Private Information would result in injury to Plaintiff and the Class. Further, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches.

233. It was foreseeable that the failure to adequately safeguard Plaintiff and the Class's Private Information would result in injuries to Plaintiff and the Class.

234. Defendants' breach of duties owed to Plaintiff and the Class caused Plaintiff and the Class's Private Information to be compromised.

235. But for Defendants' grossly negligent conduct and breach of the above-described duties owed to Plaintiff and the Class, their Private Information would not have been

compromised.

236. As a result of Defendants' failure to timely notify Plaintiff and the Class that their Private Information had been compromised, Plaintiff and the Class are unable to take the necessary precautions to mitigate damages by preventing future fraud.

237. As a result of Defendants' gross negligence and breach of duties, Plaintiff and the Class are in danger of imminent harm in that their Private Information, which is still in the possession of third parties, will be used for fraudulent purposes, and Plaintiff and the Class have and will suffer damages including: a substantial increase in the likelihood of identity theft; the compromise, publication, and theft of their personal information; loss of time and costs associated with the prevention, detection, and recovery from unauthorized use of their personal information; the continued risk to their personal information; future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the personal information compromised as a result of the Data Breach; and overpayment for the services or products that were received without adequate data security.

## SECOND CAUSE OF ACTION
**Breach of Implied Contract**
**(On Behalf of Plaintiff and the Class against Defendants)**

238. Plaintiff re-alleges and incorporates by reference all other paragraphs as if fully set forth herein.

239. Defendants required Plaintiff and the Class to provide and entrust their Private Information to Defendants as a condition of obtaining Defendants' services.

240. Plaintiff and the Class entered into implied contracts with Defendants under which Defendants agreed to safeguard and protect their Private Information and to timely and accurately notify Plaintiff and the Class if their Private Information had been breached and compromised.

241. Defendants entered into implied contracts with Plaintiff and the Class by collecting their Private Information and promising to safeguard it against unauthorized disclosures. Defendants entered into implied contracts with Plaintiff and the Class by accepting, collecting, storing, and maintaining the Private Information given to it in exchange for safeguarding the Private Information from unauthorized disclosures. Defendants breached the implied contracts with Plaintiff and the Class by failing to protect Plaintiff and the Class's Private Information from cybercriminals.

242. Defendants promised, and warranted to, Plaintiff and the Class, to maintain the privacy and confidentiality of the Private Information Defendants collected from Plaintiff and the Class and to keep such information safeguarded against unauthorized access and disclosure.

243. Defendants' adequate protection of Plaintiff and the Class's Private Information was a material aspect of these implied contracts.

244. Plaintiff and the Class conferred a monetary benefit on Defendants in that Plaintiff and the Class were required to pay Defendants for services, a portion of which should have been specifically allocated towards adequate data security.

245. Without the Private Information provided by Plaintiff and the Class, Defendants could not derive revenue from their regular business activities. A portion of the revenue derived from the services provided to Plaintiff and the Class was to be used to provide a reasonable level of data security and reasonable data security practices. The amount of revenue to be allocated to data security is known to Defendants.

246. Defendants accepted possession of Plaintiff and the Class's Private Information for the purpose of providing goods and services and implicitly agreed to protect their Private Information from data breaches and keep it confidential and secured.

247. The implied promise included consideration beyond those pre-existing general duties owed under state and federal regulations. The additional consideration included implied promises to take adequate steps to comply with specific industry data security standards and FTC guidelines and industry standards on data security.

248. The implied promises include but are not limited to: (1) taking steps to ensure that any agents who are granted access to Private Information also protect the confidentiality of that data; (2) taking steps to ensure that the Private Information that is placed in the control of their agents is restricted and limited to achieve an authorized (3) restricting access to qualified and trained agents; (4) designing and implementing appropriate retention policies to protect the Private Information against data breaches; (5) applying or requiring proper encryption; (6) multifactor authentication for access; and (7) other steps to protect against foreseeable data breaches.

249. Based on this implicit understanding, Plaintiff and the Class accepted Defendants' offers and provided Defendants with their Private Information to obtain good and services and employment.

250. Plaintiff and the Class would not have permitted their Private Information to be collected and stored by Defendants had they known that Defendants would not safeguard their Private Information, as promised, or provide timely notice of a data breach.

251. Plaintiff and the Class fully performed their obligations under their implied contracts with Defendants.

252. Defendants materially breached the implied contracts by failing to safeguard Plaintiff and the Class's Private Information, by failing to adhere to FTC guidelines and industry standards, or by ensuring that their provider had adequate safeguards to protect the Private Information, and by failing to provide Plaintiff and the Class with timely and accurate notice of

the Data Breach.

253. As a result of Defendants' failures to fulfill the data security protections promised, Plaintiff and the Class did not receive the full benefit of their bargains with Defendants and instead received services of a diminished value compared to that described in the implied contracts. Plaintiff and the Class were therefore damaged in an amount at least equal to the difference in the value of the services with data security protection they paid for and that which they received.

254. As a direct and proximate result of Defendants' breach of their implied contracts with Plaintiff and the Class and the consequential Data Breach, Plaintiff and the Class have suffered injuries and damages as set forth herein and have been irreparably harmed, as well as suffering and the loss of the benefit of the bargain they struck with Defendants.

255. Upon information and belief, Defendants have not provided Plaintiff and the Class with information regarding the root cause of the Data Breach and the steps Defendants are taking to ensure that Private Information remains safe and protected from further disclosures.

256. The losses and damages Plaintiff and the Class sustained (as described above) were the direct and proximate result of Defendants' breach of their implied contracts with Plaintiff and the Class.

257. Plaintiff and the Class are entitled to damages, including compensatory, punitive, and/or nominal damages, and/or restitution, in an amount to be proven at trial.

## THIRD CAUSE OF ACTION
**Unjust Enrichment**
**(On Behalf of Plaintiff and the Class against Defendants)**

258. Plaintiff re-alleges and incorporates by reference all preceding allegations, as if fully set forth herein.

259. Upon information and belief, Defendants fund their data security measures entirely

from their general revenues, including from payments made by and/or on behalf of their patients, including Plaintiff and the Class, in exchange for services, for which Defendants collected and maintained Plaintiff and the Class's Private Information.

260. As such, Plaintiff and the Class conferred a monetary benefit on Defendants, by providing Defendants with their valuable Private Information as a portion of value and monies derived from Plaintiff and the Class is to be used to provide a reasonable level of data security, and the amount of the portion of each made that is allocated to data security is known to Defendants.

261. Defendants enriched themselves by saving the costs they reasonably should have expended on data security measures to secure Plaintiff and the Class's Private Information.

262. Instead of providing a reasonable level of security that would have prevented the Data Breach, Defendants instead calculated to avoid their data security obligations at the expense of Plaintiff and the Class by utilizing cheaper, ineffective security measures. Plaintiff and the Class, on the other hand, suffered as a direct and proximate result of Defendants' failure to provide the requisite security.

263. Under the principles of equity and good conscience, Defendants should not be permitted to retain the monetary value of the benefit belonging to Plaintiff and the Class, because Defendants failed to implement appropriate data management and security measures that are mandated by industry standards.

264. Defendants acquired monetary benefit and Private Information through inequitable means in that they failed to disclose the inadequate security practices previously alleged.

265. If Plaintiff and the Class knew that Defendants had not secured their Private Information, they would not have agreed to provide their Private Information to Defendants.

266. Plaintiff and the Class have no adequate remedy at law.

267. As a direct and proximate result of Defendants' conduct, Plaintiff and the Class have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the loss of the opportunity how their Private Information is used; (iii) the compromise, publication, and/or theft of their Private Information; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their Private Information; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (vi) the continued risk to their Private Information, which remain in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect Private Information in their continued possession and (vii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the Private Information compromised as a result of the Data Breach for the remainder of the lives of Plaintiff and the Class.

268. As a direct and proximate result of Defendants' conduct, Plaintiff and the Class have suffered and will continue to suffer other forms of injury and/or harm.

269. Defendants should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and the Class, proceeds they unjustly received from them.

**FOURTH CAUSE OF ACTION**
**Invasion of Privacy—Intrusion Upon Seclusion and Public Disclosure of Private Facts**
**(On Behalf of Plaintiff and the Class against Defendants)**

270. Plaintiff re-alleges and incorporates by reference all preceding allegations, as if fully set forth herein.

271. Plaintiff and the Class had a legitimate expectation of privacy regarding their highly sensitive and confidential Private Information and were accordingly entitled to the protection of this information against disclosure to unauthorized third parties.

272. Plaintiff and the Class successfully took reasonable and appropriate steps to keep their Private Information confidential from the public.

273. Defendants owed a duty to its patients, including Plaintiff and the Class, to keep this information confidential.

274. The unauthorized acquisition (i.e., theft) by a third party of Plaintiff and the Class's Private Information is highly offensive to a reasonable person.

275. The intrusion was into a place or thing which was private and entitled to be private. Plaintiff and the Class disclosed their sensitive and confidential Private Information to Defendants in order to receive services, but they did so privately, with the intention that their information would be kept confidential and protected from unauthorized disclosure. Plaintiff and the Class were reasonable in their belief that such information would be kept private and would not be disclosed without their authorization.

276. Defendants' conduct also represents a public disclosure of private facts in that the disclosure was made to cybercriminals—individuals in a special relationship with Plaintiff and the Class in that they are the exact group from whom the expected cybersecurity measures are intended to protect Plaintiff and the Class.

277. The Data Breach constitutes an intentional interference with Plaintiff and the Class's interest in solitude or seclusion, either as to their person or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

278. Defendants acted knowingly when it permitted the Data Breach because it knew its

information security practices were inadequate.

279. Defendants acted knowingly when it failed to notify Plaintiff and the Class in a timely fashion about the Data Breach, thereby materially impairing their mitigation efforts.

280. By intentionally failing to keep Plaintiff and the Class's Private Information safe, and by intentionally misusing and/or disclosing said information to unauthorized parties for unauthorized use, Defendants intentionally invaded Plaintiff and the Class's privacy by:

a. Intentionally and substantially intruding into Plaintiff and the Class's private affairs in a manner that identifies Plaintiff and the Class and that would be highly offensive and objectionable to an ordinary person;

b. Intentionally publicizing private facts about Plaintiff and the Class, which is highly offensive and objectionable to an ordinary person; and

c. Intentionally causing anguish or suffering to Plaintiff and the Class.

281. As the Restatement explains, as used throughout the Restatement of Torts, intent "has reference to the consequences of an act rather than the act itself." Restatement (Second) of Torts § 8A, cmt. A (1964). "Intent is not, however, limited to consequences which are desired. If the actor knows that the consequences are certain, or substantially certain, to result from her act, and still goes ahead, she is treated by the law as if she had in fact desired to produce the result." *Id.* cmt. B.

282. Indeed, given the foreseeability of the harms inherent in data breaches and the ubiquitous nature of data breaches, Defendants were substantially certain that its failure to implement reasonable cybersecurity standards would lead to an invasion of Plaintiff and the Class's privacy.

283. Acting with knowledge, Defendants had notice and knew that its inadequate cybersecurity practices would cause injury to Plaintiff and the Class.

284. As a proximate result of Defendants' acts and omissions, Plaintiff and the Class's

Private Information were stolen by a third party and is now available for disclosure and redisclosure without authorization, causing Plaintiff and the Class to suffer damages.

285. Unless and until enjoined and restrained by order of this Court, Defendants' wrongful conduct will continue to cause great and irreparable injury to Plaintiff and the Class because their Private Information is still maintained by Defendants with its inadequate cybersecurity system and policies.

286. Plaintiff and the Class have no adequate remedy at law for the injuries relating to Defendants' continued possession of their sensitive and confidential records. A judgment for monetary damages will not end Defendants' inability to safeguard Plaintiff and the Class's Private Information.

287. In addition to injunctive relief, Plaintiff, on behalf of herself and the Class, also seeks compensatory damages for Defendants' invasion of privacy, which includes the value of the privacy interest invaded by Defendants, the costs of future monitoring of their credit history for identity theft and fraud, plus prejudgment interest and costs.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendants, as follows:

(a) For an order determining that this action is properly brought as a class action and certifying Plaintiff as the representative of the Class and her counsel as Class Counsel;

(b) For an order declaring that Defendants' conduct violates the laws referenced herein;

(c) For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

(d) For damages in amounts to be determined by the Court and/or jury;

(e) For an award of statutory damages or penalties to the extent available;

(f) For pre-judgment interest on all amounts awarded;

(g) For an order of restitution and all other forms of monetary relief; and

(h) Such other and further relief as the Court deems necessary and appropriate.

**JURY TRIAL DEMANDED**

Plaintiff demands a trial by jury of all claims in this Class Action Complaint so triable.

Dated: March 17, 2026

Respectfully submitted,

*/s/ Andrew E. Mize*

Andrew E. Mize (Ky Bar No. 94453)
J. Gerard Stranch, IV*
Grayson Wells*
**STRANCH JENNINGS & GARVEY, PLLC**
The Freedom Center
223 Rosa L. Parks Avenue, Suite 200
Nashville, TN 37203
(615) 254-8801
amize@stranchlaw.com
gstranch@stranchlaw.com
gwells@stranchlaw.com

Lynn A. Toops*
Amina A. Thomas*
**COHENMALAD, LLP**
One Indiana Square, Suite 1400
Indianapolis, Indiana 46204
T: (317) 636-6481
F: (317) 636-2593
ltoops@cohenmalad.com
athomas@cohenmalad.com

***Pro hac vice forthcoming***

***Attorneys for Plaintiff and the Proposed Class***